United States District Court
Southern District of Texas
**ENTERED**
January 11, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARIA WILSON,

          Plaintiff,

vs.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

CIVIL ACTION NO. 4:15-CV-711

## MEMORANDUM AND ORDER

Plaintiff Maria Wilson seeks judicial review of the denial of disability benefits under Title II of the Social Security Act. Plaintiff filed a Motion for Summary Judgment seeking a remand for a *de novo* hearing before the Administrative Law Judge ("ALJ"). [Doc. 10]. Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, opposes Plaintiff's motion and seeks an Order affirming the decision. [Doc. 11].[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to have this Court conduct all further proceedings in this case, including ordering entry of judgment. [Doc. 6].

---

[1] The Commissioner's brief is not styled as a cross-motion for summary judgment, but seeks affirmative relief. The fact that the Commissioner has not styled her brief as a cross-motion does not preclude the Court from issuing judgment in her favor. *See, e.g., Morton v. Califano*, 481 F. Supp. 908, 914 n.2 (E.D. Tenn. 1978) ("[w]hile summary judgment is frequently utilized as a procedural device in Social Security appeals such procedure is not technically correct or necessary under the provisions of 42 U.S.C. § 405(g)" (internal quotation marks omitted)).

This Court held a hearing on December 15, 2016, and ruled from the bench that Plaintiff failed to establish that she was disabled before the last day of her insured status. Having considered the parties' briefing, argument of counsel, the applicable legal authorities, and all matters of record, the Court concludes that Plaintiff's motion should be **DENIED** and the Commissioner's decision should be **AFFIRMED**. This Memorandum and Order sets forth the reasons for the decision.

I.     **BACKGROUND**

    A.     **Procedural Background**

On December 7, 2012, Plaintiff filed an application under Title II for a period of disability and disability insurance benefits. She also filed a Title XVI application for Supplemental Security Income ("SSI") benefits, alleging disability beginning September 1, 2002. These claims were denied initially and on reconsideration. Plaintiff then requested an administrative hearing before an ALJ to review the denial of benefits.

Administrative Law Judge John Sullivan held a hearing on August 28, 2013. R. 1158. On November 20, 2013, the ALJ held a second hearing after receiving additional evidence. R. 1200. Plaintiff and a vocational expert appeared and testified at both hearings. Plaintiff's husband testified at the first hearing. On March 19, 2014, the ALJ issued a Partially Favorable Decision, finding no disability under sections 216(1) and 223(d) of Title II through March 31, 2002, the

date last insured, and finding a disability under section 1641(a)(3)(A) of Title XVI of the Social Security Act, beginning on December 7, 2012.[2] R. 12-28. On February 2, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision final. R. 4-6.

Plaintiff then filed her complaint in this case, seeking judicial review of the Commissioner's denial of her Title II claim for benefits. [Doc. 1]. *See* 42 U.S.C. § 405(g) (providing for judicial review of the Commissioner's final decisions).

### B.    Factual Background

Plaintiff's argument in this Court is based on her mental disability. Plaintiff asserts that the ALJ erred when he failed to adopt her consulting expert's opinion that her mental impairment began on March 30, 2003, at which time she met one of the Listings, § 12.08 Personality Disorder. Pl.'s Mot. Summ. J. 6 [Doc. 10]; *see* R. 1130-34 (Dr. Robert Harper, Ph.D.'s answers to Mental Impairment Questionnaire dated November 14, 2013).

Plaintiff's application for benefits initially stated that she was suffering from a neck fusion and depression. R. 111. She claims the onset date was September 1, 2002. *Id.* In the Function Report – Adult, R. 129, she complained of pain to her

---

[2] Plaintiff is not eligible to receive payment for any month before her application for SSI benefits, which was on December 7, 2012. *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335. Although the ALJ found a disability as of December 7, 2012, Plaintiff was not awarded any SSI benefits because Title XVI Supplemental Security Income applications consider the spouse's income, which in this case, negated any award. This finding is not part of the appeal.

back and legs as a result of a fall at a movie theatre in August 2002. R. 130, 135-138. She also complained of seizures that began on September 29, 2002. R. 130, 138. She complained of muscle weakness, stiffness, R. 139, and mental health issues, R. 149-55, all of which she said began in 2002. Her last insured date for Social Security benefits is March 31, 2003. R. 104.

After the second hearing in this matter, the ALJ stated on the record that he had reviewed the file twice and planned to review it and the recordings of the hearings again before issuing his opinion. R. 1224. In a thirteen page opinion, the ALJ reviewed and summarized Plaintiff's voluminous medical records from Dr. Merritt in 1999 through October 17, 2013, when she consulted with Robert Harper, Ph.D. The ALJ found that, on May 25, 2011, Dr. Teresa Rameden examined and diagnosed Plaintiff with major depression.[3] He further found that "there is no indication that the [Plaintiff] sought or received treatment for depression during the period at issue." R. 19. He noted the entry in Dr. Pinchot's records from October 13, 2003, which stated that Plaintiff's activities were "highly functional" and that the medication allowed her to be functional. *Id.*

The ALJ summarized Dr. Harper's salient findings. He also indicated that Plaintiff saw the state agency medical consultant, Sarah Jackson, Ph.D., who prepared a report on June 30, 2011. Dr. Jackson found no medically determinable

---

[3] The record, however, says "single episode." R. 337.

mental impairment from September 1, 2002 to June 30, 2011. R. 26. Finally, the

ALJ summarized the findings of the physician's-assistant, who found Plaintiff had

limitations on her ability to work.  He ultimately concluded that Plaintiff did not

have a mental or physical disability prior to the last insured date.

III.    **STANDARD OF REVIEW**

The Social Security Act sets out the standard of review, as follows:

> The court shall have power to enter, ***upon the pleadings and***
> ***transcript of the record***, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security, with or
> without remanding the cause for a rehearing. The findings of the
> Commission of Social Security as to any facts, if supported by
> substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g) (emphasis added)).

Judicial review of the Commissioner's denial of disability benefits is limited

to two inquiries: first, whether the Commissioner applied the proper legal

standards to evaluate the evidence and, second, whether the final decision is

supported by substantial evidence on the record as a whole. *See Audler v. Astrue*,

501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir.

2005). "Substantial evidence" is relevant evidence that a reasonable mind might

accept as adequate to support a conclusion. *Audler*, 501 F.3d at 447 (citing

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is more than a mere scintilla

and less than a preponderance. *Id.*; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209

F.3d 448, 452 (5th Cir. 2000).

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present. *Perez*, 415 F.3d at 461. In determining whether substantial evidence of disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Id.* at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *Id.* at 461 (citing *Richardson*, 402 U.S. at 390). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Audler*, 501 F.3d at 447. In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Perez*, 415 F.3d at 461.

## IV.   ANALYSIS

### A.   Title II of the Social Security Act Authorizes Disability Insurance Benefits

The Social Security Act permits the payment of insurance benefits to persons who have contributed to the program and who suffer a physical or mental disability. 42 U.S.C. § 423(a)(1)(D). "Disability" is defined as the

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is defined as

an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*Id.* at § 423(d)(3). "The suffering of some impairment does not establish disability; a claimant is disabled only if she is 'incapable of engaging in *any* substantial gainful activity.'" *Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1987)).

**B.**   **Plaintiff Must Establish Disability Before the End of Insured Status**

The Social Security Act places the burden of establishing disability on the claimant. "She must show that she was disabled on or before the last day of her insured status." *Ware v. Schweiker,* 651 F.2d 408, 411 (5th Cir. 1981); *accord Perez*, 415 F.3d at 461; *Anthony*, 954 F.2d at 292, 295; *Miller v. Astrue*, No. 4:07-cv-2611, 2008 WL 8053474, at *2 (S.D. Tex. Sept. 8, 2008) (Ellison, J.). If the claimant becomes disabled *after* she has lost insured status for disability insurance benefits under Title II, the claim must be denied, notwithstanding the existence of a disability or past work history. *See* 42 U.S.C. § 416(i)(3); *Anthony*, 954 F.2d at 295; *Ware*, 651 F.2d at 411 n.3. Thus, the relevant time period is September 1, 2002, the alleged onset date, through March 31, 2003, the last date Plaintiff was

insured. Mindful of this end date, we examine subsequent events to determine the light they may shed on any disability Plaintiff suffered before her insured status terminated. *Ware*, 651 F.2d at 411 n.3.

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work. *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.[4] The claimant has the burden to prove disability under the first four steps. *Perez*, 415 F.3d at 461. If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial gainful employment that is available in the national economy. *Id.* Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut the finding. *Id.*; *Newton*, 209 F.3d at 453. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

---

[4] The Commissioner's analysis at Steps Four and Five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *Perez*, 415 F.3d at 461-62. The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

In this case, the ALJ first determined that Plaintiff met the insured status requirements for Title II disability insurance benefits through March 31, 2003. R. 18. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 1, 2002. *Id.* At Step Two, he found that Plaintiff had four severe impairments: degenerative disc disease of the lumbar spine, a seizure disorder, borderline personality disorder, and major depressive disorder. *Id.* At Step Three, he found that Plaintiff's impairments, considered singularly or in combination, did not meet the impairments listed in the Social Security regulations. R. 19. Significantly, the ALJ found that Plaintiff's subjective complaints were not fully credible. R. 21.

Before proceeding to Step Four, the ALJ considered Plaintiff's residual functional capacity ("RFC") prior to the expiration of her insured status and concluded that she was able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday, was limited to jobs that did not require exposure to dangerous machinery and unprotected heights, or commercial driving. Mentally, Plaintiff was limited to simple, routine, and repetitive tasks that were not performed in a fast-paced production environment. She was limited to simple work related decisions, and relatively few workplace changes, with occasional interaction with supervisors, coworkers, and the public. R. 20.

At Step Four, the ALJ determined that Plaintiff was not capable of performing her past relevant semi-skilled work as a statistical clerk. R. 26. At Step Five, the ALJ relied on the vocational expert's testimony and concluded that Plaintiff could perform other jobs in the national economy, including office helper, office cleaner, and mail clerk, prior to December 7, 2012. R. 27. He concluded that Plaintiff was not under a disability prior to December 7, 2012 (which includes through March 31, 2003, the date last insured). R. 28.

### C.   Plaintiff's Arguments for Reversal

Plaintiff argues that the ALJ erred because he failed to completely adopt the opinion of consulting expert Dr. Harper that Plaintiff met a Listing and that the onset of the mental impairment began on March 30, 2003.

### 1.   The ALJ Must Consider All Medical Opinion Evidence

The ALJ reviewed the opinion evidence from Dr. Harper, who did not treat Plaintiff. The ALJ stated that his finding was consistent with Dr. Harper's opinion. R. 26.

An ALJ is legally required to evaluate *every* medical opinion he receives, and to consider certain factors when deciding how much weight to give the medical opinion. 20 C.F.R. § 404.1527(b) and (c).[5] Medical opinions of physicians

---

[5] Fifth Circuit precedent requires an ALJ to give "controlling weight" to the opinion of a *treating* medical source's opinion, *if* the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence in the record. *Newton*, 209 F.3d at 455 (internal quotation marks and citations omitted); *see* 20 C.F.R.

who examine the claimant, even if they do not have a treating relationship with the claimant, are entitled to additional weight. 20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). A specialist's opinion about medical issues within his or her area of specialty is afforded greater weight than a generalist's opinion. *Id.*; *see* 20 C.F.R. § 404.1527(c)(5). An ALJ may discount the weight given to a physician's opinion when the physician's statements are brief and conclusory, are not supported by medically acceptable clinical, laboratory, or diagnostic techniques, or are otherwise unsupported by the evidence. *Newton*, 209 F.3d at 456 (noting that even a treating physician's opinion may be discounted on such a record). Relevant factors regarding the proper weight to give to a non-treating medical opinion are: the support of the physician's opinion afforded by the medical evidence of record, the consistency of the opinion with the medical record as a whole, and the physician's specialization. *Id.*; 20 C.F.R. § 404.1527(c).[6]

In his written opinion, the ALJ recounted in detail Dr. Harper's findings. R. 25. He accepted Dr. Harper's findings for the SSI disability claim, but found no disability prior to March 31, 2003. In reaching this conclusion, however, the ALJ

---

§ 404.1527(c); *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir. 1995). Dr. Harper was not a treating physician; he was a consultant.

[6] However, because the ultimate determination of disability is reserved to the Commissioner, a medical source's conclusion that a claimant is "disabled" or "unable to work" is not dispositive. 20 C.F.R. 416.927(d)(1); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *see also Thibodeaux v. Astrue*, 324 F. App'x 440, 444 (5th Cir. 2009).

failed to comment on the weight he gave to Dr. Harper's notation that the onset of this mental disorder occurred beginning on March 30, 2003.

Although Dr. Harper reported that the onset of the mental disability was March 30, 2003, one day before the insured status expired, he cited no support for this date. In fact, as the ALJ observed, the record is devoid of any treatment or examination given to Plaintiff at that time. The record does not show any incident that would reflect any onset of the impairment on that date or between September 1, 2002 and March 31, 2003. Dr. Harper is not a treating doctor, nor a medical doctor. He interviewed the Plaintiff once in 2013, ten years after the purported onset of the disability. His report listed the information he reviewed and relied on and it does not state that he reviewed any of the medical records. R. 112. An acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled. *Oldham v. Schweiker*, 660 F. 2d 1078, 1084 (5th Cir. 1981). It must be supported by clinical or laboratory findings. *Id.* Dr. Harper's answers to the questionnaire regarding the date of onset are a "Yes" and a fill in the blank, with no reference to supporting records. R. 1130, 1132. The finding of the date of onset is so brief and conclusory that it lacks persuasive weight. *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

Even a retrospective opinion like this one, given ten years after the alleged onset of the disability, must be supported by corroborating evidence. *Likes v.*

*Callahan*, 112 F.3d 189, 190-91 (5th Cir. 1997) (per curiam) ("Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability, and *properly corroborated* retrospective medical diagnoses can be used to establish disability onset dates." (emphasis added)). The corroborating evidence Dr. Harper relied on was his interview with the Plaintiff regarding her medical history.

The ALJ specifically found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to December 7, 2012 for the reasons explained in this decision." R. 21. An ALJ is required to make credibility findings when adjudicating a claim of disability. SSR 96-7p, 1996 WL 374186, *1 (1996). Social Security policy states that an adjudicator must evaluate the "intensity, persistence, and functionally limiting effects of [a claimant's] symptoms" to determine their effect on the person's ability to do basic work activities, and that this evaluation "requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." *Id.*

The ALJ summarized medical records of Plaintiff's treating physicians from 1999 through August 2013 that supported his conclusion, including records from Dr. Pinchot, Dr. Nauta Haring, Dr. Ranganathan, an MRI scan on January 16, 2004, and a discogram on April 12, 2004. R. 20-26. The ALJ's extensive citations to the record demonstrate that his conclusion about Plaintiff's credibility is

supported by substantial evidence.[i] Thus, Plaintiff's interview with Dr. Harper is not sufficient corroborating evidence in light of the ALJ's finding. When other evidence in the record supports a conclusion contrary to the opinion of an examining physician, the Secretary's regulations allow the ALJ to reject the opinion of the examining physician. 20 C.F.R. § 404.1526 (1979); *Warncke*, 619 F.2d at 417.

The ALJ also noted that the state agency consultant reviewed the medical records and reported that there was no medically determinable mental impairment from September 1, 2002 through June 30, 2011, the date of her review. R. 26. State agency medical consultants are highly qualified physicians and psychologists. They are experts in disability evaluation, and ALJs are required to consider their opinions. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Thus, the ALJ had conflicting medical evidence from equivalent specialists on when the onset of the disability occurred. In the face of conflicting medical evidence, an ALJ is not obliged to accept unsupported opinions. *See Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (unsupported treating physician report may be discounted). An ALJ may discount the weight of one medical expert relative to other medical experts where the evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Newton*, 209 F.3d at 456 (even conclusory treating physician opinion may be

discounted). Dr. Jackson's opinion, which is based on her review of the medical records, supports the ALJ's conclusion that Plaintiff was not disabled at any time through March 31, 2003. R. 28. The ALJ had substantial medical evidence in the record to support his conclusion regarding the onset of Plaintiff's disability. Dr. Harper's conclusory opinion, which was based on the Plaintiff's statements that the ALJ already found not entirely credible, was the only medical evidence to the contrary.

These considerations of supportability and consistency are factors that *Newton* and the federal regulations direct an ALJ to consider. The ALJ amply demonstrated good cause for his consideration of Dr. Harper's opinions for prospective disability only. *See Newton*, 209 F.3d at 456. In light of this finding that there was no disability prior to March 31, 2003, whether the ALJ should have found that Plaintiff met one of the Listings need not be further addressed.

The ALJ's decision was supported by substantial evidence and must be affirmed. *Perez*, 415 F.3d at 461.

### 2.   Harmless Error

Even if the ALJ was required to explain in his decision the weight given to Dr. Harper's opinion and the reasons for discounting Dr. Harper's finding that the disability arose on March 30, 2003 or that Plaintiff satisfied a Listing, any error is harmless. "Procedural perfection is not required" as long as "the substantial rights

of a party have not been affected." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1998) (citations omitted). The opinion demonstrates that the ALJ considered the medical records as well as Dr. Harper's opinion, which he otherwise accepted but for the onset date. The failure to explain his rationale was not prejudicial to Plaintiff and irrelevant to the ALJ's ultimate disability conclusion. The medical records simply do not support any finding of a disability before March 31, 2003.

Prior to March 31, 2003, Plaintiff had many doctor visits that reflect routine medical care from her primary care physician and others with episodic visits for various ailments or injuries. The records contain entries reflecting that Plaintiff suffered from various medical conditions during the relevant time period. The records do not contain any evidence of a physical or mental disability prior to the last insured date. The salient medical records for the period prior to and immediately after the alleged date of onset are as follows:

Early records from 1996 through 1999 reflect that Plaintiff intermittently saw a therapist, Sandra Cornwell, MA LPC.  She was diagnosed at that time with Borderline Personality Disorder. R. 988; *accord* R. 976-1003. There is no finding in those records that Plaintiff was unable to function in her daily living activities or maintain gainful employment. To the contrary, her therapist said her depression was improved. R. 988. Her therapist's final conclusion was that Plaintiff's alcohol consumption was the "real issue." R. 978; *see also* R. 979 ("pt. drank way too

much"); R 983 ("pt. worried she is drinking more"); R. 988 ('pt. gets drunk to make husband mad"); R. 989 ("drinking a whole lot").

The records reflect that, during that same period and continuing through 2002, Plaintiff's primary care physician, Dr. Dorothy Merritt, prescribed medication for Plaintiff's mental health issues. R. 594-623. The medical records do not contain any mental health diagnosis, do not reference Borderline Personality Disorder, and contain only passing references to depressive disorder. One record, on December 8, 1998, states that Plaintiff was being treated for depression and that issues were discussed at length. R. 619. On May 2, 2002, Plaintiff discussed her medication for her depression, which she had been taking for four years, and was concerned that it was causing her to gain weight. She reported to her physician that she "thinks depression is controlled at this point." R. 602.[7]

During the 1998 through 2002 time frame, the records are devoid of any indication that Plaintiff was unable to function in her daily activities as a result of her mental health disorder. Between May 2, 2002, and September 1, 2002, the date of onset, there is no entry in the records that indicates any mental disability. Likewise, there is no entry in the records before March 31, 2003, the last insured date, that indicates any mental disability.

The records reflect a long history of pain management treatment, beginning

---

[7] Similarly, in 1997, Plaintiff was upset that she gained a lot of weight, R. 985, and took herself off her medication because she wanted to lose weight, R. 982.

in September 2002. On August 17, 2002, Plaintiff was hospitalized after a fall at a movie theatre, where she tripped and fell on her side. She complained of severe pain in her right hip and knee. R. 965. On August 20, 2002, Plaintiff saw Dr. Merritt who referred her to Dr. Pinchot for pain management. R. 599. Dr. Pinchot initially consulted with Plaintiff on September 11, 2002 and continued to see her on a regular basis through at least June 1, 2005. R. 212-41. Dr. Pinchot's records chronicle his treatment for her ongoing pain in the lower back and right leg over the course of that time. He treated her through a series of injections, various procedures, and pain medication. At no point before March 31, 2003, does Dr. Pinchot indicate that Plaintiff had any difficulty or limitation on her daily activities.

To the contrary, the medical records before and after the end of insurance coverage establish that Plaintiff was treated for pain and was navigating her daily life under her doctor's care. On January 6, 2003, Plaintiff reported that, following the second injection on December 17, 2002, she was much better and had six days of relief from pain. R. 238. On January 9, 2003, she received another injection. R. 236. On January 27, 2003, she reported that the last procedure helped her for a couple of days. Her pain was at a 6 out of 10 and she was tender. R. 235. On January 30, 2003, she received another injection. R. 233. On February 10, 2003, she reported no improvement. R. 232. On February 27, 2003, she received another

injection. R. 230. On March 6, 2003, she reported no improvement and complained of pain to the right buttock and leg. R. 229. The last day of disability insurance coverage was March 31, 2003, but Plaintiff did not visit Dr. Pinchot again for two months.

On May 5, 2003, Plaintiff reported that she did well for the past nine weeks, during which time her insured status ended. R. 228. During that visit, she complained that the pain had returned. *Id.* On May 8, 2003, she received more injections. R. 227. On May 14, 2003, she reported that she had five days of relief and Dr. Pinchot discussed an alternate procedure for longer relief, to which Plaintiff agreed. R. 226. She had the procedure on June 6, 2003. R. 225. On July 7, 2003, she reported that her back pain was much improved and that she used less medication and the pain was tolerable. R. 224. On July 22, 2003, she had another follow-up procedure. R. 222. On August 13, 2003, she reported she was 90% improved, but the pain had returned. R. 220. On August 21, 2003, she had multiple injections and several other procedures. R. 218. On September 2, 2003, she had additional injections and repeat procedures. R. 216. On September 9, 2003, she reported 95% improvement in her back, but increased pain in her right leg following the injections. R. 215. On September 16, 2003, she had a repeat of the injections and procedures. R. 214.

On October 13, 2003, she reported that she was improved, even though she

still had leg pain. Dr. Pinchot noted that her "[a]ctivities of daily living are highly functional. She is working full-time. Medication allows her to be functional." R. 212. On October 23, 2003, she received another round of injections and procedures. R. 210.

On November 12, 2003, Plaintiff reported that she was 80% improved following the last round of treatments, but that the pain started to return. For the first time, eight months after disability insurance coverage expired, the medical records state that her "activities of daily living are moderately restricted." R. 208. For the next several visits, the doctor's notes reflect that her activities were moderately restricted. R. 204-08.

On March 15, 2004, a year after her insurance coverage expired, Plaintiff reported for the first time that her daily living activities were "highly restricted and getting worse." R. 202. She continued to see Dr. Pinchot and the notes reflect variation in the restrictions on her activities from restricted to moderately restricted. R. 189-96. On September 29, 2004, more than two years after the purported onset of her disability, she reported that her daily activities were "severely restricted." R. 188. After several follow-up visits, on April 4, 2005, Plaintiff stated that her lower back and right leg pain "is worsening over time" and that she was doing moderately well with medication, which was required for her to be "even minimally active." R. 181. During this time frame, there are no records

showing any diagnosis or treatment for any mental disorders.

Because the medical records do not support Dr. Harper's conclusory form answer and Dr. Harper's opinion conflicted with the state agency medical consultant's opinion, the ALJ did not err in failing to adopt his onset date, and any error in his failure to explain was harmless. *See Sawyer v. Astrue*, 300 F. App'x 453, 455 (9th Cir. 2008).

## V.   <u>CONCLUSION</u>

Therefore, it is **ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. 10] is **DENIED**. The Commissioner's decision is **AFFIRMED**. A final judgment will issue separately.

Signed on January 11, 2017, at Houston, Texas.

*Dena Palermo*
_____
Dena Hanovice Palermo
United States Magistrate Judge

---

i Even Dr. Harper questioned Plaintiff's credibility, providing further support to discount Plaintiff's statements regarding the intensity and onset of her disability. Plaintiff has repeatedly stated that she graduated from Texas A&M with a degree in Biology, *e.g.,* R. 1002, and was in medical school before she was forced to drop out because of complications with her pregnancy, R. 1003 (completed one year of medical school); R. 155 (was a medical student at UTMB Galveston); R. 1166 (testified she dropped out after her fourth year of medical school). She apparently repeated this claim to Dr. Harper. He became suspicious because Plaintiff's IQ test scores were so low that this statement was not credible. R. 1128. Dr. Harper attempted to obtain verification of her education from Plaintiff, but never did, which led him to conclude that she had made up the story and he attributed it to her mental health condition. R. 1128-29.

The record contains ample evidence to justify questioning Plaintiff's credibility. For example, Plaintiff testified at the second hearing that the reason she was upset about Dr. Harper's request

for her transcripts was that it brought back bad memories of her first marriage. She testified that she didn't want her current husband to know that she had been married before. R. 1214. This statement is simply not credible given that her husband sat through and testified at the first hearing, R. 1187, and Plaintiff testified about her first marriage and pregnancy at that hearing, R. 1166. He also helped her complete the questionnaire for her disability application, R. 1187, which references her prior marriage and her son, R. 155. In addition, she testified that her son lives with them, R. 1165, which indicates that her current husband was well aware of her prior marriage and the child from that marriage.

Even Plaintiff's story about her first pregnancy changed over time. At one point, Plaintiff reported that she was pregnant with her second child when she dropped out of medical school. R. 1003. During the second hearing before the ALJ, she testified that she was pregnant with twins. R. 1214 (testified that she lost her twins). At the first hearing, she testified that she was pregnant with triplets. R. 1158 (lost two of the triplets); R. 1166 (lost two of the triplets). No mother would be confused about whether she was pregnant with a singleton, twins, or triplets, particularly if she had in fact lost two of the triplets.

Finally, other evidence calls Plaintiff's credibility into question. As early as October 2003, Dr. Pinchot noted in his records that he counseled Plaintiff about drug abuse and addiction. R. 212.  She assured him that she was taking her medication for its intended purpose. In 2007, however, Dr. Allon's office apparently caught her trying to get pain medication from more than one doctor. R. 633.  In 2013, Plaintiff denied any wrong doing, claiming she did not realize that obtaining medications from two pain doctors at the same time created any conflict. R. 158. In 2011, Dr. Lilly Chen terminated her clinic's relationship with Plaintiff because she was getting pain medication from more than one doctor. R. 666, 669, 671. At the time, Plaintiff attempted to justify her actions and told Dr. Chen that she had a teenager living with her that had stolen her drugs. R. 669. In 2013, however, Plaintiff denied this allegation saying that her questioning of the doctors' treatment was the real reason she was release from their care. R. 158.

In conclusion, the Court finds that there is more than sufficient evidence to support the ALJ's finding questioning Plaintiff's credibility.